Ruth JOHNSON et al.

v.

Henry C. WHITE, Individually, and as Commissioner of Welfare, State of Connecticut.

Civ. No. 14620.

United States District Court, D. Connecticut.

June 12, 1972.

William H. Clendenen, Jr., David M. Lesser, New Haven, Conn., for plaintiffs.

Francis J. MacGregor, Asst. Atty. Gen., East Hartford, Conn., for defendant.

RULING ON DEFENDANT'S MOTION TO TERMINATE THE PRELIMINARY INJUNCTION and MEMORANDUM OF DECISION, FINDINGS OF FACT and CONCLUSIONS OF LAW

I.

BLUMENFELD, Chief Judge.

This controversy between the plaintiffs, welfare recipients under Aid to

Families with Dependent Children (AF DC), and the defendant, the Commissioner of Welfare of the State of Connecticut, arose when the defendant proposed to convert virtually the entire AFDC program to a "flat grant" system, effective November 1, 1971. The proposed system, entitled the Connecticut Family Assistance Plan (CFAP), was designed to simplify AFDC payments by averaging the budgeted needs of each size of assistance unit and by making identical payments to every family within each size of assistance unit on the basis of this consolidated standard of need. Under the terms of the CFAP as originally proposed, not only were the needs of recipients to be averaged, but also payments were to be made at the rate of 85% of actual need. . This represented a 15% reduction in the level of benefits, since Connecticut purported to meet 100% of the needs of eligible individuals prior to the CFAP.

The plaintiffs instituted this suit on behalf of all AFDC recipients to challenge the CFAP on two grounds: first, they claimed that the 15% reduction in the level of benefits to AFDC recipients was a denial of equal protection in violation of the fourteenth amendment, since other welfare programs were not to be subjected to similar reductions; and second, they claimed that the CFAP violated § 402(a)(23) of the Social Security Act, 42 U.S.C. § 602(a) (23), in that the defendant had improperly computed the standard of need in devising the CFAP.[1]

The plaintiffs' constitutional claim which on the recent authority of Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct.

1724, 32 L.Ed.2d 285 (1972), is without merit, was never pressed in this court. For this reason, a three-judge district court was not convened; a single judge is sufficient to decide the merits of the pendent federal statutory claim. See Rosado v. Wyman, 397 U.S. 397, 401–405, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); cf. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). Jurisdiction, on the basis of the plaintiffs' claim of a denial of equal protection, was properly laid under 42 U.S. C. § 1983 and 28 U.S.C. § 1343(3).

On the basis of the plaintiffs' showing of irreparable injury, and arguable questions on the merits, a preliminary injunction was entered on October 28, 1971, enjoining the defendant from implementing the CFAP pending the decision of this case on the merits of the statutory claim. Subsequently, this court invited the participation of the Department of Health, Education & Welfare (HEW) as amicus curiae to obtain the opinion of HEW as to whether the proposed CFAP complied with the requirements of 42 U.S.C. § 602(a)(23). HEW thereafter undertook a massive review of the several factors involved in the proposed CFAP, and as a result of its criticisms the defendant incorporated many changes suggested by HEW with respect to the proper updating of the standard of need for particular items. The CFAP, so revised, has been approved by HEW, as set forth in its lengthy brief, filed April 3, 1972.

In the final stages of this extensive undertaking,[2] the defendant dropped his

---

1. The original complaint in this case, filed September 13, 1971, challenged proposed welfare regulations which would have partially instituted flat grants only for special needs and shelter allowances. These regulations were withdrawn on October 5, 1971, but their substance was incorporated in the CFAP. The complaint was amended on October 15, 1971, to challenge the full CFAP on the grounds set forth above. The defendant's subsequent attempt to implement the regulation concerning only special needs was the subject of a later motion for contempt in this

case. See Memorandum of Decision on Plaintiffs' Motion for Contempt, filed December 7, 1971.

2. As will be seen *infra*, the plaintiffs directed a large number of specific challenges to many different aspects of the defendant's proposed system of making flat grant payments to AFDC beneficiaries. Consideration of these required examination and analysis of voluminous records maintained by the defendant and of the data underlying them. Their validity and the methods in which they were

proposal of a ratable reduction in the level of benefits, so that the defendant will continue the level of payments to recipients at 100% of need. Thus, the plaintiffs' non-meritorious constitutional claim of a denial of equal protection because of the selective reduction in the level of benefits is also now moot. Despite the changes which have been made by the defendant, the plaintiffs continue to press their claim that the standard of need has been improperly computed. Since the parties and the court have "invested substantial time" and energy in the resolution of the pendent claim under federal statute, the court in its discretion will proceed to the merits of this claim. Rosado v. Wyman, *supra*, 397 U.S. at 404 n. 4, 90 S.Ct. 1207. Although the case is presently before the court on the defendant's motion to terminate the preliminary injunction, the scope of the evidence presented at the hearing on that motion, covering every remaining issue in the case, makes it appropriate for the court to proceed to a final judgment on the merits.

## II.

Title 42 U.S.C. § 602(a)(23) requires that states administering categorical welfare assistance programs employing federal funds

"provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted."

According to the Supreme Court:

"two broad purposes may be ascribed to § 402(a)(23) (42 U.S.C. § 602(a)(23)): First, to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need; second, to prod the States to apportion their payments on a more equitable basis. Consistent with this interpretation of § 402(a)(23), a State may, after recomputing its standard of need, pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the *actual* standard of need." Rosado v. Wyman, *supra*, 397 U.S. at 412–413, 90 S.Ct. at 1218.

In *Rosado*, the Court held that a state need not tailor each recipient's welfare payment to his particular needs, but could "consolidate items on the basis of statistical averages . . . (p)roviding all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging . . . ." *Id.* at 419, 90 S.Ct. at 1221.

The court is concerned here only with these two elements: the adequacy of the standard of need as reflected in the CFAP and the statistical method of averaging employed by the the state to reach that standard. The adequacy of a proposed payment in any individual case is not at issue, and the court recognizes that any program under which needs are averaged and payments made on a "flat grant" basis will inevitably lower the payments made to some individuals while raising payments to others. The defendant has represented to the court that the payments to about 9000 assistance units will be lowered, while about 20,000 assistance units will receive higher payments under the CFAP. Estimated annual cost of the AFDC program under the CFAP is about $4.5 million greater than the cost of the AFDC program as presently administered, assuming that payments continue to be made at 100% of need. Cf. *Rosado, supra*, where New York's "consolidation" of special needs had the effect of reducing the cost of its AFDC program by about $40 million.

To prepare the CFAP, the defendant randomly selected a sample of 3079 as-

used by the defendant in setting up the flat grant system were called into ques-

tion by the plaintiffs through their industrious and dedicated counsel.

sistance units from the total, at the time of the survey, of about 27,000 assistance units in the AFDC program. The recurrent monthly benefits paid for the month of May 1971 and non-recurrent benefits for the preceding year were transcribed and processed by computer to produce monthly and yearly averages for the component factors of need for each assistance unit size. Upon review by HEW, the defendant updated certain of the components to reflect changes in the cost of living, as more fully discussed *infra*.

■ The defendant adopted a pre-sample confidence interval of 95%, plus or minus 10%; and a post-sample check determined that the selected level of confidence had in fact been met. The defendant's sampling technique was approved by HEW. The plaintiffs claim that in certain components of need for certain assistance unit sizes, the sample size was too small to guarantee the selected level of confidence. The defendant's confidence level, however, was for the average of budgeted needs as a whole, rather than for each component in the standard of need. Giving due weight to the expert opinion of HEW, the court finds that the defendant's sampling technique was adequate.

### III.

#### Statistically Distinct Populations

The court first considers that aspect of the CFAP which will have the greatest impact on recipients. As proposed, the CFAP represents an averaging of the cost of virtually all the needs[3] of each recipient unit, based on the number of persons in each unit. Thus, the flat grant to each assistance unit containing three persons, for example, will be the same.

The plaintiffs have shown that there are two basic types of assistance unit: those units in which the number of recipients equals the number of persons living in the household (hereinafter "equal assistance units") and those units in which the welfare recipients live in a household with persons not eligible for AFDC assistance (hereinafter "unequal assistance units"). An example of the equal assistance unit is a mother and two children living alone. A typical example of the unequal assistance unit is where three children live with their mother and stepfather, and the adults are ineligible for AFDC benefits. Each of these examples is an assistance unit of three. The plaintiffs have shown, however, that the average budgeted needs of equal assistance units are substantially higher than the average budgeted needs of unequal assistance units. For assistance units of three for example the average need of an unequal assistance unit is bout $50 per month less than that of an equal assistance unit; that is, according to the defendant's figures for budgeted needs, three recipients living with others need about $50 per month less than three recipients living alone. Thus, when the needs of these two types of assistance units are combined in a weighted average, the resulting figure represents a reduction of the average need of the equal assistance unit and an increase for the unequal assistance unit.

The plaintiffs claim that this averaging of allegedly "statistically distinct populations" is impermissible under § 602(a)(23) and *Rosado, supra,* arguing that the defendant in effect is lumping apples with oranges. The plaintiffs contend that the defendant thereby obscures the standard of need for the equal assistance unit.

■ While the averaging of the needs of equal and unequal assistance units will certainly have a significant impact on equal assistance units, the court cannot hold that such averaging is impermissible under § 602(a)(23). In *Rosado, supra,* New York had proposed to convert its previous method, of paying for special

---

3. Certain special needs will continue to be paid outside the flat grant, as more fully discussed *infra.*

needs on an individual basis, to a periodic flat grant to each assistance unit, which would also cover special needs. The Court approved New York's method of averaging the cost of special needs.[4] Under New York's proposed flat grant system, the cost of special needs was to be averaged across the entire recipient population, not simply across that subdivision of the population of recipients who received allowances for special needs. Thus, the two populations, those who had received special needs and those who had not, were to be merged in the average, with *every* recipient receiving a small allowance for special needs. The impact of this merging process would be severe on those who had formerly received special needs allowances, since that portion of the flat grant representing special needs would be the cost of special needs averaged among all recipients, rather than the average cost to that subdivision of recipients who had been found eligible for special needs.

The situation is similar here, as between equal and unequal assistance units. The equal assistance units will, on the average, receive less than they need, and the unequal assistance units will receive more. But the unequal and equal assistance units are not more "statistically distinct" than the recipient populations eligible and ineligible for special needs in *Rosado*. It is not in violation of § 602(a)(23) to average their needs.

■ Despite *Rosado*, the plaintiffs also claim that the defendant may not average the cost of special needs across the entire recipient population, arguing that the averaging of special need expenditures is an inequitable averaging of statistically distinct populations. As discussed above, the averaging of the needs of these precise populations, those who

do and do not receive special needs, was approved by the Court in *Rosado*. Although the plaintiffs claim that this alleged defect was not brought to the Court's attention in *Rosado*, there is no reason to believe that the Court was unaware of the effect of averaging special needs across the entire recipient population. The court holds that the defendant may so average special needs here, consistent with § 602(a)(23).

The plaintiffs' final claim with respect to impermissible averaging of statistically distinct populations goes to the defendant's averaging of virtually all the needs of assistance unit sizes 10 through 15, except for food, clothing, personal incidentals and household supplies. That is, for assistance unit sizes 10 through 15, the defendant averaged the budgeted needs for shelter, excess utilities, recurrent and non-recurrent needs, so that the standard of need as established by the CFAP is, with respect to these items, the same for a family of 10 as for a family of 15. The plaintiffs allege that such an averaging obscures the standard of need for the larger families.[5]

There is no direct evidence that, because of economies of scale, the cost of the needs of larger families with respect to the particular items averaged tends to be the same; and the plaintiffs contend that, since the cost of these items increases with family size in assistance unit sizes 1 through 9, it may be expected to do so for the larger units as well.

The defendant's expert in charge of the averaging process, Richard Gertzof, testified that the small number of recipient families in the higher assistance units prompted the consolidation. For example, at the time of the survey, there was only one assistance unit size 15; and the budgeted needs of this unit, princi-

---

4.  The Court also found in *Rosado* that New York had impermissibly lowered the standard of need, by excluding certain special needs which had previously been a part of the standard. See Rosado v. Wyman, *supra*, 397 U.S. at 415–419, 90 S.Ct. 1207.

5.  The plaintiffs also challenge the reliability of the defendant's sample of these

larger assistance units. But the court has found that the defendant was not required to achieve 95% reliability for each component of the standard of need. See footnote 1, *supra*. Neither was he required to establish this level of confidence for each assistance unit size.

pally because the family was living in public housing, were smaller than the average of assistance units 10 through 15, for consolidated items.

█ The court holds that, in light of this problem as well as possible economies of scale at this level, it was permissible for the defendant to average, for assistance unit sizes 10 through 15, the costs of shelter, excess utilities, recurrent and non-recurrent needs. Since the averaging itself was fair, the standard of need for assistance units size 10 through 15 as a whole was not obscured, and the requirements of § 602(a)(23) were not violated. Cf. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

## IV.

### Standard of Need for Rent

The plaintiffs' next major claim is that the defendant obscured the true standard of need for shelter allowances by basing the CFAP standard of need for rent on the budgeted needs of the assistance units surveyed.[6] The plaintiffs' general claim here is that the amount budgeted by the defendant for rent, which was the basis for the CFAP average, did not meet the true cost of rent.

The defendant's policy has been to pay the rent as charged, where the recipients live in public housing. Where the recipients live in private housing, rent is budgeted on the basis of the cost of a comparable unit of public housing, plus 10%, up to a maximum of $160 per month, with an additional 10% allowed for furnished housing. Beyond these standard allowances, the defendant allowed over-standard rents to be budgeted and paid in a sizable number of cases, constituting about 28% of the total caseload.

To determine the extent to which budgeted rents fell short of the actual cost for rent, the defendant undertook a separate housing survey, the results of which are contained in HEW Brief, App. 13. Out of 463 cases randomly selected, 115 families lived in public housing, and thus budgeted rent reflected actual cost. Out of the remaining 348 families living in private housing, 131 had over-standard budgeted rents. Most significant, in only 7 cases, or about 2%, did the budgeted rent fail to meet actual need. Of these cases, the actual rent averaged about $14 per month higher than budgeted rent.

The court holds that, in view of this housing survey, the defendant's use of budgeted rent fairly reflected the actual needs of recipients. Although in 2% of the cases, the actual need was greater than the budgeted need, the court finds that this discrepancy is de minimis.[7]

The plaintiffs have raised additional questions, however, with respect to the maximums budgeted for rent in certain situations. Where AFDC children live with non-needy, non-legally liable relatives, shelter maximums are budgeted at the rate of $20 per month for one child, $30 per month for two children, and $40 per month for three or more children. Connecticut Welfare Manual, Vol. 1 (hereinafter Manual), § 352 at 5. The defendant also defines actual need for these recipients at that rate; that is, there is no indication that, in the housing survey discussed above, the defendant inquired as to whether such recipients were actually charged more for rent. Indeed, it is hard to imagine that more for rent than the defendant allows could be exacted from such children, unless their supervising relatives give them less food or clothing. Similarly, where the assistance unit resides with a stepfather, the

6. The plaintiffs' claim that the defendant inadequately updated the maximum rent allowance to reflect changes in the cost of living is considered *infra*.

7. In seven cases budgeted rent fell short of actual rent, by an average of $14, representing a total unmet need of $98. Distributing this sum over the entire sample of 463 cases, each recipient unit's rent allowance would be increased by 21 cents per month, assuming that the seven cases were evenly distributed according to family size.

shelter allowance is budgeted on the basis of a prorated share of actual rent, or a prorated share of the maximum rent standard for private housing in the community, whichever is less. Manual § 345.3 at 2. Where assistance units reside with legally liable relatives or non-legally liable relatives or friends, the shelter allowance is also determined in this way. Manual § 352 at 4. Ordinarily, the prorated share of the private housing standard is lower, and thus is the amount budgeted for rent. The plaintiffs contend that these maximums do not reflect actual need, and their use in the CFAP averages thus obscures the true standard of need for rent.

▮▮ The plaintiffs, however, have offered no evidence that recipients in the categories described above are being charged more for rent than the prorated maximums budgeted by the defendant. Rather, the plaintiffs rely on the statement by the court in Rosado v. Wyman, 437 F.2d 619, 628 (2d Cir. 1970) (on remand from the Supreme Court), that the defendant, in consolidating welfare payments on the basis of statistical averages, has the "burden to justify the new schedules." But such justification, beyond revealing the basis of his statistical averages, is required only where the plaintiffs make some showing, as in Rosado, that the defendant has impermissibly lowered the standard of need. Cf. Marotti v. White, 342 F.Supp. 823 (D. Conn. 1972). The court holds that the defendant did not obscure the standard of need for rent by averaging the budgeted rent allowances for the classes of recipients described above.[8]

▮ The plaintiffs also claim that the standard of need for rent was obscured by the inclusion, in the survey sample, of assistance units whose rent was budgeted at zero, because their shelter need was met from another source. The plaintiffs contend that since all people need shelter, the standard of need is lowered imper-

missibly by taking into account those persons who receive shelter without cost to the defendant. But a fair averaging may take into account those who do not in fact have a need for a shelter payment, just as the cost of special needs may be averaged across the entire recipient population, including those recipients who do not require them. It was permissible for the defendant to include in the average of budgeted shelter needs those assistance units who had no need for a shelter allowance. The plaintiffs do not claim that the sample included a disproportionate number of zero budgeted rents.

## V.

### Items Omitted From CFAP

▮ The plaintiffs contend that the standard of need represented by the CFAP excludes or includes only on a restricted basis certain items which were a part of the standard of need in Connecticut on the effective date of § 602(a) (23), January 2, 1968. The plaintiffs' major claim here goes to certain allowances for special items of clothing, such as oversize and promotional clothing, the availability of which was allegedly restricted by Departmental Bulletin No. 2226, issued on January 22, 1969. These formerly available items, the plaintiffs argue, were thus not included in the CFAP sample year of June 1970 to May 1971, and hence not included in the standard of need.

The defendant has explained the January 22, 1969, policy change as follows:

"(E)very AFDC recipient adult, school child and preschool child was brought up to standard and given all the clothing necessary to maintain a standard of health and decency. After that time the only supplemental clothing payments that were made were (for) clothing to bring a family coming on AFDC up to standard, layettes, out-

---

8. For the same reason, the plaintiffs' claim that where the recipients reside with non-recipients the defendant obscured the standard of need for special needs and supplemental clothing allowances by averaging payments for these items rather than true needs is without merit.

size clothing and replacement of clothing because of a catastrophic event such as fire." Defendant's Trial Brief at 10.

In reviewing the CFAP, HEW examined the 1969 policy change and concluded that clothing allowances were not restricted. Most persuasive, the defendant undertook a survey of clothing allowances before and after the 1969 policy change by comparing the average monthly amount expended per case by family size in 1967 with amounts expended during the CFAP survey period. The study revealed a much larger expenditure for each family size during the later period, when the 1969 policy was in effect. See HEW Brief, App. 17. ·The plaintiffs' claim is thus found . by the court to be without merit, in that the standard of need for clothing was not reduced by the defendant by virtue of Departmental Bulletin No. 2226.

■ The plaintiffs claim that in January 1968 recipients were granted telephone allowances for reasons other than medical need, rural isolation or employment, and that these allowances were discontinued prior to the survey period. Since the total telephone expenses during the CFAP survey period averaged about $1.00 per month per assistance unit, and since the evidence indicates that relatively few telephone allowances were formerly granted for reasons other than medical need, rural isolation or employment, the inclusion of these additional allowances in the standard of need would have very little effect on the standard. The court, therefore, finds this claim de minimis and it is dismissed.

■ The plaintiffs also claim that since the Connecticut Welfare Department in January 1968 recognized in the standard of need, as expenses incident to employment, the cost of lunches at the rate of 75 cents daily and the cost of transportation to and from work, the elimination of these allowances in January 1969, Manual § 332.32, impermissibly lowered the standard of need. HEW states that

"The State's new policy concerning this item (§ 332.32) . . . is currently pending before HEW since the item was the basis for one of the issues of the Conformity Hearing." HEW Brief at 18.

See Connecticut State Dept. of Public Welfare v. Department of Health, Educ. & Welfare, 448 F.2d 209 (2d Cir. 1971).

These expenses, however, are relevant only to the determination of eligibility for assistance and of work-related expenses; their allowance by the defendant, while it would render more persons eligible for assistance and increase the work-related expenses for working recipients, would not be reflected by an increase in the CFAP standard of need, as based on the budgeted needs of recipients. This claim is, therefore, without merit with respect to the flat grant system in issue in this proceeding.

[11] The plaintiffs also claim that allowances for lost or stolen cash, available in January 1968, were eliminated in September 1969, Manual § 384, thereby reducing the standard of need. In Rosado v. Wyman, 322 F.Supp. 1173, 1186–1187 (E.D.N.Y.1970), Judge Weinstein concluded that certain items, including allowances for lost or stolen cash, need not be included in the standard of need, on the basis of the "expert knowledge" of HEW. Although HEW has not taken a position with respect to allowances for lost or stolen cash in its brief in this case, the court concludes that the failure to include in the standard of need under the CFAP this contribution to a reserve fund against such possible losses does not violate the statute.

The plaintiffs claim that allowances for water rent and fees for a conservator or guardian, which were available during the survey period, were not included in the CFAP average. Counsel for the defendant has stated that water rent was always included in shelter allowances and was paid separately only where the recipient owned his own home. Water rent allowances were thus included in the CFAP survey, and the claim is without

merit. Counsel for the defendant has represented that fees for a conservator or guardian will continue to be paid under proposed Manual § 5030, as needed, outside the flat grant. Although Manual § 5030 does not appear to contain a provision for the payment of fees for a conservator or guardian, the court will accept the representation of the defendant's counsel with respect to such payments under Manual § 5030.

■ The plaintiffs also complain that allowances for a practical nurse and for hearing aid maintenance have been excluded from the standard of need in the CFAP. The defendant has represented that these items will continue to be available under Title XIX medical coverage, for which all AFDC recipients are eligible. Although removal of these items from the method of direct payment under AFDC might technically be considered a diminution of the standard of need, in practical effect the items will still be available, according to the defendant. The claim is thus without merit.

## VI.

### Insufficient Updating

■ The plaintiff complains that the defendant has insufficiently updated a number of items to reflect changes in the cost of living. Under § 602(a)(23), states which had not updated the components of the standard of need between January 2, 1968, and July 1, 1969, are required to update to reflect changes in the cost of the component to July 1, 1969. The plaintiffs argue that if the state failed to update *any* item by July 1, 1969, *all* the components of the standard of need must be updated to July 1, 1969. Cf. Plaintiffs' Exhibit MM, Nebraska Conformity Hearing, January 18, 1971. This argument is unpersuasive. The limit of the state's responsibility, with respect to items which it failed to update before July 1, 1969, is to bring them up to the standard of July 1, 1969. Other items, which were updated after January 2, 1968, and before July 1, 1969, need not be repriced. HEW supports this interpretation of the statute. HEW Brief at 5.

■ The plaintiffs also claim that the defendant erred in updating items on the basis of the National Consumer Price Index, United States Urban Average. The plaintiffs contend that the defendant should have used the regional Consumer Price Index (CPI) for New York City or Boston, as more reflective of costs in Connecticut. The defendant, in updating, employed cost study method B, provided in HEW State Letter of October 17, 1969, which requires use of "the U. S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index, for the appropriate region . . . ." HEW Brief, App. 5, at 2. HEW supports the defendant's position that this regional index requirement does not apply to Connecticut, since Connecticut does not contain one of the 23 Standard Metropolitan Statistical areas for which there are individual city indexes; in such circumstances, the United States City Average CPI will suffice. Relying on the expert opinion of HEW, the court holds that the use of the national urban average CPI was sufficient, and that the plaintiffs' claim is without merit.

■ The plaintiffs contend that the defendant's update of the private housing maximum rental allowance in March 1970, from the 1962 figure of $125 to the July 1969 figure of $160 per month, an increase of 27.5% based on the urban average CPI, was inadequate. The plaintiffs contend that, based on the testimony of employees of the defendant, rents in Connecticut rose by more than 40% from 1962 to 1969. In view of the review and acceptance of this update of 27.5% by HEW, and in view of the rental survey undertaken by the defendant and discussed *supra*, HEW Brief, App. 13, which demonstrated that budgeted rents met the actual cost of rent in more than 98% of the cases, the court finds that the update of 27.5% was adequate.

■ The plaintiffs also complain that the defendant insufficiently updated the public housing area maximums, upon which the standards for public rental

housing were based, in some areas of the state. Based on HEW's acceptance of the updates and on the defendant's survey comparing budgeted with actual rents, HEW Brief, App. 13, the court finds that the updates were adequate. The plaintiffs' claim that the consolidated average for shelter costs impermissibly lowered the maximum rents in some areas is without merit. Any averaging process has the effect of lowering the higher allowances. Similarly, the plaintiffs' claim that the CFAP shelter component must be voided because the previous policy of setting different rates for private housing based on the local public housing rates was not a uniform statewide standard, see Boddie v. Wyman, 434 F.2d 1207 (2d Cir. 1970), aff'd, 402 U.S. 991, 91 S.Ct. 2168, 29 L.Ed.2d 157 (1971), is without merit. The effect of the CFAP is to establish a uniform statewide standard; an intermediate step of first creating a uniform statewide standard before incorporation in the CFAP flat grant system is not required.

■ The plaintiffs also make the claim, which at first appears to contradict their claim with respect to a statewide standard for rent, that because of higher rental costs in Fairfield County the defendant must raise the standard of need for rents in that particular geographic area. That is, the plaintiffs contend that Boddie v. Wyman, *supra*, 434 F.2d 1207, which held that New York could not set different standards of need for different areas in the state without a factual basis, stands for its opposite: that a state may not impose a uniform statewide standard of need where costs in fact vary across the state. The court finds this contention without merit. The plaintiffs do not contend that welfare recipients in Fairfield County were inadequately represented in the CFAP survey of sample cases. The defendant has fairly averaged the needs of recipients for rent across the state to determine the standard of need; he may apply that standard statewide. Boddie v. Wyman, *supra*.

The plaintiffs also claim that the defendant erred in the updating of certain components of the allowance for food, clothing, personal incidentals and household supplies, as well as for certain special needs. On the basis of the review and significant updating of these items required by HEW, and the approval of the final results by HEW, the court finds that these items were sufficiently updated to satisfy the requirements of § 602(a)(23).

## VII.

### *Exclusion of Certain Recipients*

■ The plaintiffs also claim that the CFAP survey is invalid because of the exclusion from the AFDC universe of about 3000 families who had been impermissibly removed from the AFDC rolls because of an error by the welfare department in calculating work-related expenses for purposes of determining eligibility. See Campagnuolo v. White, Civ. No. 13,968, Orders of the Court of June 30, 1971, and October 7, 1971 (D. Conn.). The plaintiffs have not shown, and employees of the defendant deny, that the standard of need for these AFDC families is higher than for the population of AFDC recipients as a whole. The plaintiffs' claim that the CFAP survey was skewed by their omission from the sample universe is, therefore, without merit.

## VIII.

### *Items Restricted in Availability*

In addition to their challenges to the adequacy of the averages which go to make up the standard of need in the flat grant portion of the CFAP, the plaintiffs also attack that part of the CFAP in which the defendant proposes to meet certain special needs of recipients as they occur, outside the flat grant and on an individualized basis. Proposed Manual § 5030. The plaintiffs contend that a number of items, which are now available to recipients and will not be included in the flat grant, will be available under Manual § 5030 only on terms

which are more restrictive than at present; the reduced availability of these items, the plaintiffs contend, represents a reduction in the standard of need.

The defendant does not contend that the previous allowances for these items were averaged in the CFAP survey, and thus contained in the flat grant. The items of allegedly restricted availability at issue under Manual § 5030 are as follows:

(1) Under the CFAP, Manual § 5030 at 11–12, payment for the care of a child outside the home, in either a foster home or the home of a relative, where the supervising relative is temporarily absent or incapable of caring for the child, will be limited to three months. Under the previous policy, Manual § 265.1, there was apparently no durational restriction. While a three month period for providing substitute care may be useful for internal administrative guidance, it cannot serve to terminate the obligation to provide for the care of the child.

(2) Under the CFAP, the cost of property repairs, up to a maximum of $500, will be available under Manual § 5030 at 1–2, on a once-only basis. The previous policy contained neither the limit of $500 nor the single-occasion limit. Manual § 364.4. No justification for this limitation has been furnished or suggested.

(3) Under the CFAP, furniture, furnishings, appliances and clothing, including sales tax thereon, will be replaced only when they have been damaged or destroyed by a catastrophic event, which is defined as a "natural disaster" which "arises suddenly." Manual § 5030 at 3–4. The plaintiffs claim that under the previous policy and practice, Manual § 364.1, Plaintiffs' Exhibits S, ZZ-20, and PP-11, 13 and 17 (fair hearing decisions), these items were sometimes replaced for reasons other than a natural disaster, including when the items were lost, stolen, or otherwise destroyed. HEW, however, states that repair costs for furniture, household furnishings and appliances were included in the CFAP averages and thus reflected in the standard of need. HEW Brief at 20.

(4) Under the CFAP, hotel accommodations, including the sales tax thereon, and restaurant meals will be allowed only where the recipient is forced to move because of a natural disaster or judgment of eviction. Manual § 5030 at 3–4. The plaintiffs claim that under previous policy, these items were also allowed if the recipient had a "need to relocate immediately due to an emergency situation." Manual §§ 352 at 7, 351.14.

(5) Under the CFAP, school expenses will be allowed to a maximum of $12.50 per month. Previously, an allowance for school expenses was not provided by official departmental policy except as a $10 deduction from the earnings of working recipients, Manual § 332.5A; but in practice, school expenses were sometimes allowed, apparently without monetary limit. Plaintiffs' Exhibit EE. The previous allowance of school expenses, although outside official departmental policy, brings such expenses within the standard of need. Rosado v. Wyman, *supra*, 322 F.Supp. at 1185. However, since it does not appear that school expenses were regularly granted on an extensive basis, the $12.50 allowance under § 5030 appears satisfactorily to carry over this item under the CFAP. "(T)he extent to which it was recognized (previously) has been adequately carried over to the present" under the CFAP. Rosado v. Wyman, *id.* at 1185.

■ It is unclear, however, that a rigid construction will be given to proposed Manual § 5030 by the defendant's employees in its administration. Much of the evidence upon which the plaintiffs rely to show that the availability of these items will be restricted under § 5030 consists of administrative examples [9] of generous construction in the past of these regulations governing special needs. In the absence of specific instances of deprivation of special needs because of "restricted availability" un-

9. Fair hearing decisions and 52–T forms (needs budgeted by caseworkers' individual cases).

der § 5030, the court considers this group of claims to be premature. These claims are, therefore, dismissed as prematurely brought, without prejudice to their renewal in specific cases after the administrative contours of § 5030 have been established in practice.

A related claim made by the plaintiffs is that the effective date of assistance for a newborn child will be postponed under the CFAP, thereby lowering the standard of need. Under the previous policy, the effective date of the addition of a newborn child to the welfare rolls has been the date of birth. Manual § 371.1. Under the CFAP, "(w)hen a child is born . . . the assistance payment is increased effective the first of the month following the month of change." Proposed Manual § 5020 at 5. This restriction on the availability of assistance to newborn children will have the effect of reducing the standard of need, for all those who are not born on the last day of the month. It may be somewhat difficult administratively to adhere to the present system of determining the date of eligibility under the terms of Manual § 371.1; presumably, however, payments made on the basis of eligibility as of the 15th of the month of birth would be a permissible averaging. Since no one is presently in being to support a challenge to the proposed system of eligibility under § 5020, any ruling at this time would be premature.

## IX.

### *Shelter Allowances for Children*

▆▆▆ The plaintiffs claim that the maximum shelter allowances for AFDC children living with non-needy, non-legally liable supervising relatives were insufficiently updated. These maximums were budgeted at the rate of $20 per month for one child, $30 per month for two children, and $40 per month for three or more children. Manual § 352 at 5. The $20 maximum for one child was updated by 27.5%. This update was adequate. See part VII of this opinion, *supra*. The maximums for two or

more children appear to have received no update, in violation of § 602(a)(23). The defendant is thus ordered to update these maximums by 27.5% on penalty of the withdrawal of federal funds for the AFDC program. The effect of this update, increasing the shelter allowance component of the relevant assistance unit sizes, will be to enlarge the flat grant to some extent. Although there is not sufficient evidence before the court to permit application of the de minimis principle, it seems unlikely that the increase should result in a percentage reduction in the level of benefits.

## X.

The court finds that the claimed deficiencies in the Connecticut Family Assistance Plan as originally proposed have been substantially remedied and that the plan as presently proposed complies with the requirements of 42 U.S.C. § 602(a)(23), with the minor exception noted above. The threat of irreparable injury to the plaintiffs has been eliminated. The court, therefore, orders that the preliminary injunction entered on October 28, 1971, against the implementation of the plan be now terminated.

It is further ordered that within a reasonable time from the date of this opinion, the defendant shall make the correction in the plan as set forth in part IX of this opinion.

The foregoing constitutes the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

Except for the claims discussed in part VIII which are dismissed as prematurely brought, and the order against the defendant in part IX of this opinion, judgment may enter for the defendant, and it is SO ORDERED.

Each party shall bear its own costs.

The court wishes to commend the diligent efforts of counsel for the plaintiffs and the defendant, and to extend special thanks to counsel for HEW, whose labors as amicus curiae significantly aided the court in clarifying and resolving the numerous issues in this case.