HOUSTON WELFARE RIGHTS ORGAN-
IZATION, INC., et al., Plaintiffs,

v.

Raymond W. VOWELL, Commissioner of
the Texas State Department of Pub-
lic Welfare, et al., Defendants.

Civ. A. No. 73–H–296.

United States District Court,
S. D. Texas,
Houston Division.

Feb. 11, 1975.

Jeffrey J. Skarda, Houston, Tex., for plaintiffs.

John L. Hill, Atty. Gen., Austin, Tex., Penny J. Brown, Asst. Atty. Gen., for defendants.

MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

In this action, plaintiffs challenge the manner in which the Texas Department of Public Welfare disburses funds under the program known as Aid to Families with Dependent Children (AFDC). The named plaintiffs, representatives of a class of welfare recipients whose welfare checks were lowered by Texas' conversion to a flat grant system on March 1, 1973, consist of the Houston Welfare Rights Organization, Inc., a non-profit corporation engaged primarily in providing welfare recipients with information as to their rights, as well as three AFDC recipients, Agnes Stafford, Dorothy Marie Phoenix and Paula Ortega, who head AFDC families. Defendants are the Commissioner of the Texas Department of Public Welfare as well as the Chairman, Vice Chairman and Secretary of the Texas State Board of Public Welfare, all of whom are sued in their individual and representative capacities.

Seeking declaratory and injunctive relief, plaintiffs allege that the manner of disbursement of AFDC funds violates federal law in two instances: (1) disbursing funds by a flat grant system rather than ascertaining the amount of each individual's needs is in violation of 42 U.S.C. § 602(a)(23) because defendants have consistently undervalued shelter and utility needs in the averaging process; (2) the Department's policy of prorating shelter and utility expenses if non-recipients share the residence of the recipient is in violation of 42 U.S.C. §§ 602(a)(7), 606(b) and 602(a)(23).

This action is presently before the Court for consideration of both plaintiffs' and defendants' motions for summary judgment.

## JURISDICTION

By their complaint, plaintiffs premise federal jurisdiction upon 28 U.S.C. §§ 1337, 1343(3) and 1343(4).

■ This Court does not find that subject matter jurisdiction of this action premised upon 28 U.S.C. § 1337 is proper. That section provides original jurisdiction in any federal district court for "any civil action or proceeding arising under any Act of Congress *regulating commerce or protecting trade and commerce against restraints and monopolies*" (emphasis added). The Social Security Act simply does not fall within the category of Congressional acts of this nature. *See* Aguayo v. Richardson, 473 F.2d 1090, 1100 (2d Cir. 1973); Almenares v. Wyman, 453 F.2d 1075, 1082 n.9 (2d Cir. 1971).

■ Nor does the Court find that jurisdiction premised upon § 1343(3) is proper. That section provides for original jurisdiction in federal district court:

> To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, or any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights . . . .

Plaintiffs do not challenge the defendants' administration of the AFDC program on any constitutional grounds. Rather, their cause of action is premised solely upon state violations of federal statutory provisions. Because provisions of the Social Security Act that provide for aid to families with dependent children are not acts "providing for equal rights of citizens . . . ." jurisdiction cannot be premised upon § 1343(3). *See* Almenares v. Wyman, *supra*.

■ However, subject matter jurisdiction premised upon § 1343(4) is cognizable. That section gives this Court jurisdiction to hear any civil action

> To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

Thus, unlike § 1343(3), this provision does not limit federal jurisdiction to claims premised upon federal statutes "providing for equal rights of citizens." In relying upon § 1343(4), plaintiffs assert that their cause of action for violation of certain provisions of the Social Security Act is a civil rights action premised upon 42 U.S.C. § 1983,[1] for which § 1343(4) provides jurisdiction. In view of the fact that the plaintiffs in this action seek to protect "rights of an essentially personal nature," including statutory rights concerning shelter and food, the Court finds that the law of this Circuit would hold that the complaint states a claim cognizable under 42 U.S.C. § 1983. *See* Gomez v. Florida State Employment Service, 417 F.2d 569, 579 (5th Cir. 1969). *See also*, Roselli v. Affleck, 373 F.Supp. 36 (D.R.I.1974); Giguere v. Affleck, 370 F.Supp. 154 (D.R.I.1974). "Such fundamental human, highly personalized rights are just the stuff from which § 1983 claims are to be made." Gomez v. Florida State Employment Service, *supra*. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1343(4).

## PROPRIETY OF A CLASS ACTION

■ The Court finds that this action is properly maintainable as a class action, pursuant to Rule 23(b)(2), Fed.R.

---

1. That section provides:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Civ.P. In this regard, the class of AFDC recipients who have received less benefits due to the flat grant system is so numerous that joinder is impracticable; there are common questions of law and fact among the various members of the class; the claims of the representative parties are typical of those of the class; the representative parties will fairly and adequately protect the interests of the class, and the defendants' actions are generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class.

## MERITS OF THE ACTION

■ The Federal Aid to Families with Dependent Children program, established by 42 U.S.C. § 601 et seq., involves both state and federal participation to the extent that funds provided by the state are matched by those of the federal government. State participation in the program is voluntary; however, once a state elects to participate, it must do so in a manner consistent with the federal statutory scheme. *See, e. g.,* Townsend v. Swank, 404 U.S. 282, 92 S. Ct. 502, 30 L.Ed.2d 448 (1971); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207,

25 L.Ed.2d 442 (1970); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). In this regard, a state is allowed a great deal of leeway to pay as much or as little as it wishes so long as its payments are made consistent with the federal statutory scheme. *See* Shea v. Vialpando, 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974); Rosado v. Wyman, *supra* 397 U.S. at 408, 90 S.Ct. 1207; King v. Smith, *supra* 392 U.S. at 318–19, 88 S.Ct. 2128.

In dispensing AFDC funds, a state must first determine "a standard of need," that is, the level at which the absence of resources will make a person eligible for public assistance. Second, the state must determine a "level of benefits," that is, the portion of the recognized standard of need that will be provided. *See* Rosado v. Wyman, *supra* 397 U.S. at 408, 90 S.Ct. 1207. Items included within the standard of need vary from state to state as does the level of need that is met by public assistance.

Prior to March 1, 1973, AFDC payments made by the Texas Department of Public Welfare were calculated by first determining the standard of need for each individual family unit.[2] Because

2. This standard of need was defined as follows:
   Personal need allowance
   (1.) $65 for an adult recipient
   (2.) $25 for a child under 18 years of age
   (3.) $39 for a child 18–21 years of age
   Rent or shelter allowance, a dollar maximum,
   (1.) For private or owned housing, as paid up to,
       (a.) 1–2 persons $33
       (b.) 2–4 persons $44
       (c.) 5 or more $50
   (2.) For public or federally subsidized housing an allowance
       (a.) 1 person $36
       (b.) 2–4 persons $42
       (c.) 5 or more $50
   Utilities allowance for private housing only $13
   Special needs
   (1.) dentures $63 once per year
   (2.) chronic chiropractic care $6 per month
   (3.) chronic podiatrist care $6 per month
   (4.) chronic dental care $6 per month
   (5.) social care up to $247.50 per month
   (6.) glasses $17 once per year
   (7.) hearing aids $80 once per year

Texas does not pay 100 percent of this recognized standard of need, this first figure was then reduced by 25 percent, the level of benefits that the state is able to pay. Any income that the family received other than welfare benefits was then subtracted from this reduced figure to obtain the amount that would actually be paid.

On March 1, 1973, the Texas Department of Public Welfare converted its program of dispensing funds by determining need on the basis of each individual family unit to a system of allocating flat grants to each household, the amount being dependent upon the number of recipients within the family unit as well as the type of family unit involved, that is, whether there was within the unit a caretaker recipient or not.[3] In determining the amount of assistance that would be paid to each category, an average expenditure for each group was determined for four seasonal dates: November, 1971; February, 1972; May, 1972 and August, 1972. These seasonal figures were then averaged to determine a single figure that would be paid year round. Keeping in mind the latitude accorded the state in this program, the Court must consider plaintiffs' allegations that the conversion to a flat grant system does not comply with the federal statutory scheme upon which federal funds are dispensed.

## THE USE OF SHELTER MAXIMUMS

■ Plaintiffs allege that the method utilized by the Texas Department of Public Welfare in converting to a flat grant system violates 42 U.S.C. § 602(a)(23) in that the maximum allowances for shelter were averaged with expenditures that met actual need but which fell below the maximum, thus resulting in lower payments to recipients who had previously received the maximum. Thus, prior to converting to a flat grant system, the state had paid benefits for shelter based upon actual need only if that need was less than the "maximum" figure that the state had set. If actual need exceeded this maximum figure, only the maximum figure was paid.

Section 602(a)(23) of Title 42 requires that the state agency:

provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted . . . .

In Rosado v. Wyman, *supra*, the Supreme Court, after reviewing the legislative history of this provision, described its purpose as twofold:

First, to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need; second, to prod the States to apportion their payments on a more equitable basis.

*Id.* 397 U.S. at 412–13, 90 S.Ct. at 1218. To accomplish this purpose, the Court held that the states must:

first, . . . re-evaluate the component factors that compose their need equation; and, second, any "maximums" must be adjusted.

However, even in light of this federal mandate, the Court in *Rosado* recognized that:

A State may, after recomputing its standard of need, pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the actual standard of need.

3. Monthly needs allowances under the flat grant system consist of the following:

| Family size | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | + |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Non-caretaker | $32 | $ 62 | $ 90 | $118 | $146 | $174 | $202 | $230 | $258 | $286 | (irregular) |
| Caretaker | $ 0 | $115 | $155 | $187 | $218 | $246 | $273 | $300 | $326 | $353 | (irregular) |

In Jefferson v. Hackney, 406 U.S. 535, 543, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), the Court recognized that Texas had complied with the provisions of § 602(a)(23). The same system of allocation upheld in *Jefferson* provided the figures that were averaged to arrive at a flat grant. However, plaintiffs allege that by averaging the shelter benefits for those recipients previously receiving the maximum payments for shelter with those recipients who receive less than the maximum results as a matter of necessity in those who had previously receive the maximum receiving less.

■ The use of a flat grant system in dispensing AFDC funds is not in and of itself a violation of any federal statutory policy. *See* Rosado v. Wyman, *supra* 397 U.S. at 419, 90 S.Ct. 1207. It is recognized that such an averaging process will result in some families receiving more benefits while other families receive less. *Id.* Roselli v. Affleck, *supra,* 373 F.Supp. at 44; Johnson v. White, 353 F.Supp. 69 (D.Conn.1969). Indeed, this is a natural result of the averaging process; those families who had previously received the largest payments will receive less, regardless of whether maximum benefits are determined through the use of a "maximum" or some other system of allocation.

■ In *Rosado,* the Supreme Court set forth the manner in which a state may comply with § 602(a)(23) in instituting a flat grant system.

> We do not, of course, hold that New York may not, consistent with the federal statutes, consolidate items on the basis of statistical averages. . . . Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistent with § 402(a)(23) redefine its method for determining need.

*Id.* 397 U.S. at 419, 90 S.Ct. at 1221. Plaintiffs appear to argue that this dicta authorizes the Court to consider whether the items included in the average were priced at their current market value or some other measure of an ideal price. The Court agrees, however, with the interpretation of the phrase "fairly priced" given by the court in New Jersey Welfare Rights Organization v. Cahill, 349 F.Supp. 501 (D.N.Y.1972), aff'd 483 F.2d 723 (3d Cir. 1973):

> By the words 'fairly priced' the Supreme Court was apparently trying to prevent a state, barred from totally eliminating a factor from the content of its former standard of need, from artificially pricing an item so low that that item would essentially be eliminated in terms of reality.

New Jersey Welfare Rights Organization v. Cahill, *supra* 349 F.Supp. at 511. To apply a more subjective interpretation to this term would be to accord federal courts power to interfere with determinations regarding the standard of need that the individual states are entitled under the law to make.

In the instant case, even though the benefits paid may not be based upon actual need, plaintiffs have failed to demonstrate that the state, in consolidating its needs figures, either omitted a previously included item of need or artificially priced an item so low that it was essentially eliminated. Furthermore, although plaintiffs urge the Court to consider, as did the Court in Roselli v. Affleck, *supra,* if the averaging process creates a broad distortion of the prior standard of need, there has been no evidence of such a broad distortion presented to support a finding by this Court that the defendants have violated § 602(a)(23) by unfairly averaging consolidated items.[4]

4. Although plaintiffs have demonstrated that the largest cuts in AFDC benefits resulting from the averaging process, were experienced by recipients living in private, as opposed to public, housing, the Court does not find that the disparity in these cuts between families of comparable size in different types of housing is so great as to create a broad distortion or an inequitable result.

■ By way of their brief in support of their motion for summary judgment, plaintiffs appear to be arguing that the flat grant system violates § 602(a)(23) because that provision was ostensibly designed to encourage the state to abandon the use of maximums. However, it was not the purpose of that statutory provision to require that states abandon the use of such methods of determining how their respective levels of need will be met. Conversely, the statute requires only that any maximums that a state chooses to use be "updated" as of July 1, 1969. In Rosado v. Wyman, *supra* 397 U.S. at 413–14, 90 S.Ct. 1207, 1218, the Court recognized that "by imposing on those States that desire to maintain 'maximums' the requirement of an appropriate adjustment, Congress has introduced an incentive to abandon a flat 'maximum' system, thereby encouraging those States desirous of containing their welfare budget to shift to a percentage system . . . ." Thus, § 602(a)(23) is not a mandate to eliminate the use of maximums; it is only an incentive to employ a more equitable system of using a percentage reduction, that is, a method whereby available funds are dispensed to meet a specified percentage of need as defined by the state. A state that chooses to continue its program of allocating maximums does not violate § 602(a)(23) so long as it adjusts the maximum to reflect changes in living costs as of July 1, 1969. Because the State of Texas increased its maximum 11 percent to comply with this mandate, *see* Jefferson v. Hackney, *supra*, and because this increase was reflected in the shelter figures averaged to implement the flat grant system, it cannot be said that the use of these updated maximums violated § 602(a)(23).

■ Moreover, this Court does not find as plaintiffs further argue that the use of maximums in determining average expenditures obscures "the actual standard of need" as prohibited by § 602(a)(23). *See* Rosado v. Wyman, *supra* 397 U.S. at 413, 90 S.Ct. 1207. In this regard the term "actual standard of need" does not mean a standard of need as determined by economic realities, but the standard of need as defined by the state prior to the passage of § 602(a)(23).[5] Section 602(a)(23), as interpreted in *Rosado,* does not require that a state's standard of need be consistent with the amount that recipients actually pay to live, only that it be adjusted upward to reflect increases in the cost of living. In requiring that standards of need be updated to reflect increases in the cost of living, § 602(a)(23), merely required a state that lacked funds to increase the actual payments to recipients to lower the level of benefits paid and to refrain from camouflaging this shortcoming by tampering with its existing standard of need. Thus, one purpose ascribed to § 602(a)(23) was that of "forcing a State to accept the political consequence of [lowering the level of benefits paid] and bringing to light the true extent to which actual assistance falls short of the minimum acceptable." Rosado v. Wyman, *supra* 397 U.S. at 413, 90 S.Ct. at 1218.

In the present case, defendants have not attempted to eliminate from the standard of need any item, nor has the state lowered the standard by placing more restrictive conditions upon the ability to qualify for such benefits. *See* Rhode Island Fair Welfare Rights Organization v. Department of Social and Rehabilitative Services, 329 F.Supp. 860 (D.R.I.1971). Thus, it cannot be said that by changing to a flat grant system defendants obscured the standard of need. *See* Johnson v. White, 353 F. Supp. 69, 78 (D.Conn.1972).

5. Although the court in Roselli v. Affleck held that the state must consider economic realities in determining a consolidated needs figure or violate § 602(a)(23), this is the result of Rhode Island's practice of defining its standard of need for shelter as the actual cost of shelter borne by the recipient, rather than using a maximum shelter figure. *See* Roselli v. Affleck, *supra* 373 F.Supp. at 43.

## THE POLICY OF PRORATING SHELTER AND UTILITY EXPENSES

The Texas Department of Public Welfare has traditionally adhered to a policy of prorating that portion of shelter and utility expenses attributable to a non-eligible individual who may be residing with recipients. The statement of this policy that was in effect during the period November, 1971, through August, 1972, when the averaging for the flat grant system occurred, is set forth in the Texas Department of Public Welfare's Financial Services Handbook, Revision Number 23, which provides as follows:

Section 3122, paragraph 5

When a recipient shares living arrangements with non-dependent relatives, his budget will carry his prorata share and that of his dependents of the utility chart figure, provided the non-dependent relative does not meet this expense for him.

Section 3122.3, paragraphs 4, 5 and 6

When the applicant or recipient lives with non-dependent relatives in their shelter, his prorata share(s) of the shelter expense [within the group maximum] shall be budgeted provided the non-dependent relative does not meet all this expense for him. This means that the applicant and/or recipient must actually be participating in meeting shelter expense before his prorata share(s) can be budgeted.

When non-dependent relatives live with the applicant in his shelter, the applicant's prorata share(s) of the shelter expenses [within the group maximum] shall be an allowable expense, providing the non-dependent relatives do not meet this expense for him.

Regardless of the economic situation of the non-dependent relative in either of the above situations, both shelter and utilities will be budgeted only in the amount of the prorata share for the applicant and his dependents.

Under these provisions, the recipient is paid that portion of the amount he would ordinarily receive if the entire household were eligible as the number of eligible parties bears to the number of non-eligible parties. Thus, if in a group of four persons living in private housing, only two of whom are eligible for AFDC assistance, AFDC shelter payments would be determined by allocating payments of 50 percent of $44.00, the maximum for a family of four. The eligible parties would receive $22.00 as opposed to $33.00, the amount to which they would be entitled if they were living alone.

Plaintiffs argue that the Texas policy of proration is in violation of 42 U.S.C. § 602(a)(7) in that it assumes that income is available to reduce unmet need. Defendants counter this argument by characterizing the proration policy as a method of determining the standard of need, which is left to the discretion of the individual state, as opposed to a method by which unmet need is reduced. Further, defendants justify the policy by arguing that it is an effective method to prevent AFDC payments from reaching the hands of individuals who are not able to receive them.

Plaintiffs' argument of an inappropriate assumption of income is premised upon 42 U.S.C. § 602(a)(7) as that provision has been interpreted in 45 C.F.R. § 233.90(a) and 45 C.F.R. § 233.20(a)(3)(ii)(c):

A State Plan for . . . AFDC . . . must . . .

(ii) Provide that, in establishing financial eligibility and the amount of the assistance payment: (c) only such net income as is actually available for current use on a regular basis will be

232

considered, and only currently available resources will be considered
. . ..

*See* Lewis v. Martin, 397 U.S. 552, 90 S. Ct. 1282, 25 L.Ed.2d 561 (1970); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Thus, it is beyond dispute that a state regulation is in conflict with federal standards if that regulation establishes an irrebuttable presumption that the income of an individual not having a legal obligation to support a recipient but residing with a recipient is utilized to meet the standard of need recognized by the state. *See, e. g.,* Lewis v. Martin, *supra* (income of stepfather may not be presumed to be available for support of stepchildren); Solman v. Shapiro, 300 F.Supp. 409 (D. Conn.1969), aff'd, 396 U.S. 5, 90 S.Ct. 25, 24 L.Ed.2d 5 (1969) (income of stepfather may not be presumed to be available for support of stepchildren); Reyna v. Vowell, 470 F.2d 494 (income of minor may not be presumed to be available for support of family); Gillard v. Craig, 331 F.Supp. 587 (W.D.N. C.), aff'd, 409 U.S. 807, 93 S.Ct. 39, 34 L.Ed.2d 66 (1972) (support payments to one child cannot be used to reduce assistance payable to siblings). However, it is also beyond dispute that a state has considerable discretion in determining its own standard of need. *See* King v. Smith, *supra* 392 U.S. at 318, 88 S.Ct. 2128. Thus, the question for determination is whether the proration policy operates as an assumption of income or is the method of determining the standard of need for households in which both recipients and non-recipients reside.

In considering the similar provisions of another state, one court has held that proration policies are not an assumption of income that violates federal law. *See* Taylor v. Lavine, 497 F.2d 1208 (2d Cir. 1974); *cf.* Owens v. Parham, 350 F. Supp. 598, 605 (N.D.Ga.1972). In this regard, the policy of proration was not held to be an assumption of income, but rather a recognition of the fact that the cost of housing per person decreased with the increase in the number of persons occupying a single dwelling.

In support of their argument, plaintiffs rely heavily upon the decision in Roselli v. Affleck, *supra,* in which the district court struck down Rhode Island's method of converting to a flat grant system because pro-rated units were averaged with units in which all residents were AFDC recipients. However, the state provisions in that instance differ from those now before the Court in that the Rhode Island plan presumed that a non-recipient man assuming the role of spouse was responsible for the support of himself as well as the woman with whom he was living. Thus, the income of the non-recipient man was assumed to be available to support a recipient, an assumption clearly in violation of § 602(a)(7). In the instant case, however, the income of the non-recipient is presumed only to satisfy his own needs and not that of recipients.

From a consideration of the Texas program, the Court does not find that the proration of shelter and utility expenses operates as an assumption of income to satisfy unmet need of a recipient. Rather, the proration policy is the result of the manner in which the state has chosen to define need for shelter and utilities. In this regard, the standard of need set forth by the Texas Department of Public Welfare remains the same for an individual living in a mixed unit as it does for an individual living in a unit in which all members are recipients. For example, during the period from which the flat grant system averages were derived, the Texas standard of need for private shelter was defined as follows:

| | |
|---|---|
| Family of 2 | $33 per month |
| Family of 3–4 | $44 per month |
| Family of 5 or more | $50 per month |

*See* Lopez v. Vowell, 5 Cir., 471 F.2d 690, 692 n. 5. Utilities were allocated per unit at a flat rate of $13 per month.

Thus, the shelter needs for an individual residing in a unit of two persons is defined by the state at $16.50 per month for each person. The shelter needs for a unit of four persons is defined as $11.-00 per month for each person. The fact that a non-recipient resides within the unit does not diminish the payments to the individual to meet his shelter needs as recognized by the state standard of need. That is, even if one member of a unit of four persons is a non-recipient, the state will continue to attempt to meet the level of need it recognizes for those individuals who are recipients; the state will continue to pay $11.00 per recipient, which is the standard of need for an individual in a four-person unit, even though the total amount received by the unit will be less.

Plaintiffs argue that a more equitable situation would result if the state were to accord shelter benefits based upon the number of recipients in the unit, rather than the total number of persons within the unit. Thus, if in a unit of four persons, two are AFDC recipients, plaintiffs would have the state define their standard of need for shelter at $33.00 or the equivalent for a family of two recipients residing alone. However, the state has chosen to recognize the economies of scale inherent in larger living groups, *see* Dandridge v. Williams, 397 U.S. 471, 479, 480, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), and to define its standard of need by the size of family units as opposed to the number of recipients residing together. This Court has no power to require that the state define this standard otherwise.

The Court is cognizant that the proration provisions of New York have been struck down in the past as violative of due process because those provisions establish an irrebuttable presumption that a non-recipient contributes his pro rata share of expenses. *See* Hurley v. Van Lare, 380 F.Supp. 167 (S.D.N.Y.1974) (three-judge panel). Other courts have held proration provisions valid facially but invalid as applied. *See* Owens v. Parham, *supra;* Mothers and Children's Rights Organization, Inc. v. Stanton, 371 F.Supp. 298 (N.D.Ind.1973). *See also* Dullea v. Ott, 316 F.Supp. 1273 (D. Mass.1970). However, plaintiffs in this case have not raised, briefed or argued due process claims. There has been no evidence presented as a matter of record with regard to the manner in which the Texas program has been administered. Accordingly, this Court does not find the due process issue before it. Plaintiffs' allegations that the state's proration policy violates 42 U.S.C. § 602(a)(7), are without merit.

Plaintiffs further challenge the proration policy as violative of 42 U.S.C. § 606(b):

> The term 'aid to families with dependent children' means money payments with respect to . . . a dependent child or dependent children . . . .

The purpose of this provision, as interpreted by HEW in its Handbook of Public Assistance Administration, is to provide the recipient with the right to manage his affairs, the choice of determining how the assistance can best be used to meet his needs and the ability to make purchases through the normal channels of commerce. *See* Handbook of Public Assistance Administration § 5120. Plaintiffs argue that these provisions prohibit a state from identifying a sum of money with the requirement that it be spent in a certain manner or in restricting a part of the payment. By providing a lower payment for fixed expenses such as shelter and utility needs, plaintiffs allege that the state has in essence identified a portion of the payments to the plaintiff to be spent on shelter and utilities.

While plaintiffs are correct in their contention that a state may not designate AFDC funds to be spent in a particular manner, their argument that proration has this effect is without merit. Section 606(b) prohibits federal aid being dispensed in kind, or payments

**234**

being made directly to vendors. *See* X v. McCorkle, 333 F.Supp. 1109, 1119 (D. N.J.1970). In the instant case, however, all payments are made in money with no condition upon how the money is to be spent. The fact that a state may provide a recipient with less than he actually needs or less than the amount it defines in its standard of need is not a condition that money be spent in a particular manner. The recipient is still provided with the choice of the manner in which he will use his resources.

▮▮▮▮▮ Lastly, plaintiffs challenge the proration policy as violative of 42 U.S.C. § 602(a)(23) by alleging that inclusion in the averaging for the flat grant system of the proration policy does not result in "fair pricing" of all elements of the prior standard of need.

By applying the more technical interpretation to the term "fair pricing" that the Court adopted earlier in this opinion, the Court does not find that the averaging of prorated shelter and utility payments in determining the flat grant system violates § 402(a)(23). In so doing, the state did not artificially lower the amount that it paid to recipients who received prorated shelter expenses. In determining the flat grant shelter allowance, the state used all shelter expenditures that were actually made the year before. The fact that the level of benefits paid does not meet the standard of need that it has defined or does not meet what some may consider necessary for an adequate existence does not mean that the flat grant is based upon elements that were not "fairly priced". *See* New Jersey Welfare Rights Organization v. Cahill, *supra* 349 F.Supp. at 511.

In accordance with the foregoing, defendants' motion for summary judgment is granted. Plaintiffs' motion for summary judgment is denied. Defendants will prepare and submit an appropriate judgment for entry within thirty (30) days.