Roseanna ROSELLI et al.

v.

Philip W. NOEL et al.

Civ. A. No. 75–321.

United States District Court,
D. Rhode Island.

May 25, 1976.

Ronald Simon, Diane Fuchs, Alden C. Harrington, R. I. Legal Services, Providence, R. I., for plaintiffs.

Harold E. Krause, Sp. Asst. Atty. Gen., State of R. I., Providence, R. I. for defendants.

## OPINION

PETTINE, Chief Judge.

The present litigation involves the "fall out" resulting from the legal battle waged between welfare recipients and the executive branch of the Rhode Island State government over the State's conversion of its method of computing payments for Aid to Families with Dependent Children ("AFDC") from one based on individual need to a "flat grant" method. That battle has been waged on two fronts, the lines first drawn in this district court, then in the First Circuit Court of Appeals, and once again in this Court. That case, which is the subject of a separate opinion issued today, 414 F.Supp. 411, was brought as a class action by the plaintiff[1] herein against one of the defendants herein, John Affleck, the Director of the Rhode Island Department of Social and Rehabilitative Services. In the instant case, plaintiff Roselli has also joined the Governor of the State as a defendant. In the first suit, which hereinafter will be referred to collectively as *Roselli I,* this Court issued a preliminary injunction barring implementation of the shelter portion of the State's flat grant program as a violation of superseding federal law, § 402(a)(23) of the Social Security Act, 42 U.S.C. § 602(a)(23). *Roselli v. Affleck,* 373 F.Supp. 36 (D.R.I.1974). That decision was affirmed on appeal, 508 F.2d 1277 (1st Cir. 1974) and, until today, has been awaiting decision on the merits.

At issue in *Roselli I* was the validity of the shelter portion of the "flat grant" which the State implemented on November 1, 1973 to provide AFDC benefits. Since the AFDC program is largely financed by the federal government, the State is required to administer it in compliance with applicable federal legislation and regulations. *Roselli I,* 373 F.Supp. at 41. In *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the United States Supreme Court interpreted 42 U.S.C. § 602(a)(23) and enunciated guidelines which a State must follow in converting to a flat grant program. The Court noted that two factors determine the amount of money a welfare recipient receives.

> "First it is necessary to establish a 'standard of need,' a yardstick for measuring who is eligible for public assistance. Second, it must be decided how much assistance will be given, that is, what 'level of benefits' will be paid.

> \*   \*   \*   \*   \*   \*

> . . . Consistent with . . . § 402(a)(23), a State may, after recomputing its standard of need [for conversion to flat grant], pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the *actual* standard of need.

> \*   \*   \*   \*   \*   \*

> . . . Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistently with § 402(a)(23) redefine its method for determining need." *Rosado v. Wyman, supra* at 408, 413, 419, 90 S.Ct. at 1216, 1218, 1221 (emphasis in original).

---

1. In a separate decision, *Roselli I* was certified as a class action consisting of all AFDC recipients residing in private housing. A separate suit, *Wilkins v. Affleck,* C.A. No. 74–136, was brought on behalf of all AFDC recipients in public housing. These two actions have been consolidated on the merits and, for purposes of the instant action, we may consider *Roselli I* as a suit on behalf of all AFDC recipients in Rhode Island.

In *Roselli I* this Court found that "in Rhode Island the 'standard of need', actual need, and payment level [were] one and the same thing" prior to conversion to the flat grant. 373 F.Supp. at 42. The Court found, however, that in redefining its shelter standard for the flat grant, the State had relied on out-dated figures and an illegal attribution of income policy which had the combined effect of lowering and obscuring the true shelter standard. As a result, it enjoined implementation of the shelter portion of the flat grant and ordered the State to continue paying shelter costs on an "as needed" basis pending resolution of *Roselli I* on the merits.

Thus, *Roselli I* had no impact on the non-shelter portion of the flat grant, which has been in effect since November 1, 1973. "Though it need not recognize inflation after the institution of the flat grant", *Roselli I, supra,* 508 F.2d at 1282, in May of 1975 the State did just that. In May, 1975, the Rhode Island General Assembly enacted and the Governor signed into law the budget for Fiscal Year 1976, which authorized a separate appropriation of $2.3 million for a "Standards Increase for AFDC and GPA [General Public Assistance]." Federal supplements to the AFDC program will result in a total pool of $4.3 million. Both the defendants had supported inclusion of this standards increase in the FY 1976 budget, defendant Affleck stating that:

"[T]he only solution to the problem of spiralling costs for welfare recipients is a standards increase which will at least keep them current with today's cost of living."

Although the defendants have not strayed from their conviction that a standards increase is urgently needed by welfare recipients to keep apace of inflation, they did not begin distribution of the appropriation with the beginning of FY 1976 on July 1, 1975. The reasons for this decision were stipulated by the parties.

"Prior to July 1st, Governor Noel decided not to distribute the Standards Increase until [*Roselli I*] was terminated.

\* \* \* \* \* \*

The Governor feared that an adverse decision in *Roselli [I]* would create fiscal requirements which the State under the current budget would be without funds to meet.

\* \* \* \* \* \*

The Governor believed that an adverse decision would create two options. These options were that the defendants would have either to seek additional funds from the General Assembly or to implement a ratable reduction.

\* \* \* \* \* \*

The Governor rejected both of these alternatives.

\* \* \* \* \* \*

Instead, and in order to avoid these two alternatives, the defendants withheld the standards increase and determined not to distribute it until *Roselli [I]* was decided in order that they could use the standards increase money to cover any costs that the *Roselli [I]* decision might impose.

\* \* \* \* \* \*

Pursuant to this decision, the defendants developed a proposal to use the Standards Increase fund to resolve the legal challenge to the shelter standard raised by *Roselli [I]*. In this plan, the defendants proposed to 'attribute' the standards increase funds to the 'pure rent factor' or to call the general standards increase a rent increase."

Shortly after this decision was made, the defendants through their counsel informed plaintiff's counsel in *Roselli I* of their plan to use the Standards Increase ("SI") to offset an increase in the rent factor, if any, caused by implementation of a shelter flat grant in conformance with this Court's previous decision in *Roselli I*. The plaintiff rejected this as a settlement proposal. On September 11, 1975, defendant Affleck again urged plaintiff, through her counsel, to accept this plan and settle *Roselli I* before October 1, 1975, because he feared that by that date the SI appropriation would have to be diverted to meet rising costs of the GPA program. Defendant Affleck ad-

vised plaintiff to "take the money and run" before it was too late.

The plaintiff interpreted this warning as an attempt to coerce her to settle *Roselli I* without pressing for a final decision on the merits. As a result, she filed the instant action on the ground that the defendants sought to deny her meaningful access to the federal court in violation of 42 U.S.C. §§ 1983 and 1985. After a hearing, this Court entered a temporary restraining order barring the defendants from dissipating the SI account. That order has been continued by consent until final resolution. Interim proceedings have left the following issues for resolution on the merits: plaintiff's request for class action certification and causes of action founded in 42 U.S.C. §§ 602(a)(23), 1983 and state law; and defendant's opposition to class certification and motion to abstain. There being no factual dispute, the parties have presented these issues by way of cross-motions for summary judgment.

*Jurisdiction*

■ Plaintiff has raised a number of bases of jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. I need not address each one if I conclude that plaintiff's constitutional cause of action under 42 U.S.C. § 1983 is not wholly insubstantial, *see, e. g.,* *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973). In that event, jurisdiction would be conferred upon the Court by 28 U.S.C. § 1343 and, in the exercise of its discretion, over all pendent federal and statutory claims. *Randall v. Goldmark,* 495 F.2d 356, 358 (1st Cir. 1974); *Silva v. East Providence Housing Authority,* 390 F.Supp. 691, 694 (D.R.I. 1975); *Lund v. Affleck,* 388 F.Supp. 137, 138–139 (D.R.I.1975). *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

■ There can be no question that plaintiff was exercising her First Amendment right to petition the government when she instituted her challenge to the shelter flat grant in *Roselli I. California Transport v. Trucking Unlimited,* 404 U.S. 508, 510–511,

513, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Smartt v. Avery,* 370 F.2d 788, 790 (6th Cir. 1967); *Sutton v. County Court of Racine County,* 353 F.Supp. 716, 718 (E.D.Wis. 1973). *See also Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *NAACP v. Button,* 371 U.S. 415, 442, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). *Cf. McQueen v. Drucker,* 317 F.Supp. 1122, 1132 (D.Mass.1970), *aff'd,* 438 F.2d 781 (1st Cir. 1971). Although "[d]irect interference with the jurisdiction of the court is the plainest sort of contempt," *Smith v. Robbins,* 454 F.2d 696, 697 (1st Cir. 1972) (citations omitted), it is not true, as defendants contend, that only intentional government interference raises a colorable First Amendment claim. In *NAACP v. Button, supra,* the United States Supreme Court found that First Amendment rights of association and to petition the government were infringed by the application to the NAACP of a facially neutral, statewide regulation of attorney practices. In *California Transport v. Trucking Unlimited, supra,* the Court considered the application of federal antitrust laws and stated, 404 U.S. at 510–511, 92 S.Ct. at 612:

"We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-à-vis* their competitors." *Cf. Boddie v. Connecticut,* 401 U.S. 371, 380, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (decided on due process grounds).

■ These decisions counsel that it is not critical for jurisdictional purposes to determine whether or not the defendants herein *intended* to penalize plaintiff for pursuing *Roselli I*; rather plaintiff has stated a cause of action under 42 U.S.C. § 1983 sufficient to invoke the Court's jurisdiction under 28 U.S.C. § 1343 by showing that the defendants' actions had that *effect.* Plaintiff in *Roselli I* represents a class consisting

of all recipients of AFDC. *See* note 1, *supra.* The SI appropriation was designed to increase the amount of money received by these recipients as of July 1, 1975. Shortly after July 1, plaintiff was advised that no one in her class would receive any benefits under the SI appropriation until *Roselli I* was terminated. Then, in September, defendant Affleck warned plaintiff that her failure to terminate *Roselli I* before October 1, 1975, was likely to result in the diversion of all of the SI money to meet rising GPA costs, and leave plaintiff's class with nothing. Whether this information was given as friendly advice or as a threat, it was relayed by the Director of the Department of Social and Rehabilitative Services with the approval of the Governor at a time when it was common knowledge that the only realistic method for terminating *Roselli I* prior to October 1, 1975, would be by plaintiff's voluntary dismissal of the action. Under these circumstances, the Court concludes that plaintiff has stated a cause of action under 42 U.S.C. § 1983 whose constitutional underpinnings are not entirely frivolous. Furthermore, the Court will assume pendent jurisdiction over the statutory claims and address them first, especially since the constitutional claim, which involves a practice of statewide applicability arguably raises jurisdictional questions under 28 U.S.C. § 2281. *See Souza v. Travisono,* 498 F.2d 1120 (1st Cir. 1974). Indeed, in order to assess the validity of plaintiff's contention that a three-judge court is not required herein, it appears that the Court would in any event be compelled to resolve the state law claim first. Plaintiff claims that a three-judge court is not required because the defendants' withholding of the SI appropriation was not related to any state statute or administrative policy, but was rather the " 'single [and] unique exercise' by a state official," *Penagaricano v. Allen Corp.,* 267 F.2d 550, 556 (1st Cir. 1959), *quoting, Phillips v. United States,* 312 U.S. 246, 252, 61 S.Ct. 480, 85 L.Ed. 800 (1941), "which state law could not reasonably be construed to authorize." *Dempsey v. McQueeney,* 387 F.Supp. 333, 341 (D.R.I. 1975), *quoting, Query v. United States,* 316 U.S. 486, 490, 62 S.Ct. 1122, 86 L.Ed. 1616 (1942). Thus, the soundness of this argument could not be tested without making a preliminary determination of the applicability of the state law upon which the defendants rely.

### Class Certification

In opposing plaintiff's request for certification, the defendants do not question the propriety of certifying a class contiguous with that certified in *Roselli I. See* note 1, *supra.* They do oppose the broader class of all AFDC and GPA recipients that is sought by plaintiff. The Court is persuaded that the requirements of "commonality," Fed.R. Civ.P. 23(a)(2), and "typicality," R. 23(a)(3), can be satisfied only by addressing each cause of action separately.

■ Plaintiff's constitutional claim under 42 U.S.C. § 1983 focuses upon defendants' alleged attempt to obstruct proceedings in *Roselli I.* Logic dictates that the class certified as to this claim be identical with that recognized in *Roselli I, i. e.,* all recipients of AFDC. *See* note 1, *supra.*

■ Plaintiff also contends that the defendants' refusal to implement the SI appropriation conflicts with federal requirements pursuant to 42 U.S.C. § 602(a)(23). Since these requirements have no application to GPA, which relies solely on state funding, the proper class as to this claim must likewise be limited to all AFDC recipients.

Lastly, plaintiff claims that the defendants have violated state law in refusing to disburse the SI to its intended beneficiaries. As to this claim, all AFDC and GPA recipients raise common questions of law and fact and the defendants' refusal is based upon grounds generally applicable to all of them. R. 23(b)(2). Since a common and finite fund is involved, R. 23(b)(1)(A) and (B) lend additional support to my conclusion that ancillary jurisdiction must be exercised so that the class certified as to the state cause of action consists of all AFDC and GPA recipients. *See Berman v. Narragansett Racing Association,* 48 F.R.D. 333, 337 (D.R.I.1969).

■ Since plaintiff has dropped her request for damages, and seeks only injunctive and declaratory relief, the matter may proceed as a class action under R. 23(b)(2) without prior notice to the class. *Yaffe v. Powers,* 454 F.2d 1362 (1st Cir. 1972); *Lund v. Affleck, supra* at 140. *Cf. Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

### State Law Claim

The State's attempt to bootstrap from explicit statutory authority for executive impoundment of appropriated funds to demonstrate that the Governor has "clear implicit" authority to withhold the SI without following any of the statutory procedures is not persuasive. I find nothing ambiguous about the laws in question so as to make abstention appropriate. Defendants assert that R.I.G.L. § 40–6–9 [2] gives the defendants virtually unlimited discretion in fashioning and implementing a flat grant program for AFDC and GPA. The proceedings in *Roselli I* and *Rosado v. Wyman, supra,* make the fallacy of this position abundantly clear. All § 40–6–9 does is require a conversion to a flat grant system "based upon a fair averaging method and in accordance with all appropriate federal regulations."

■ The defendants also cite R.I.C.L. §§ 35–3–16 [3] and 35–3–18 [4] as further evidence of the Governor's implied power to impound the SI appropriation. Section 35–3–16 prescribes procedures by which the Governor may reduce or suspend appropriations to maintain a balanced budget. Section 35–3–18 prescribes procedures for the intradepartmental transfer of an appropriation to meet an emergency. In addition, the act approving the FY 1976 budget (1975 Public Laws, Ch. 260, Art. I, § 6) itself confers upon the Governor the authority to transfer *excess* funds in an appropriation item to support other functions of the same agency or department.[5] It has been conced-

---

2. R.I.G.L. § 40–6–9 provides:
"*40–6–9. Amount and standards of assistance.*—The amount of assistance which any recipient shall receive under the provisions of sections 40–6–6, 40–6–7 and 40–6–8 shall be determined with due regard to the income and resources available to him from whatever source. The amount of assistance which any recipient eligible under the terms of sections 40–6–6, 40–6–7 and 40–6–8 shall receive, shall not exceed the standards of assistance approved and promulgated pursuant to the provisions of this section and sections 40–6–18, 40–6–20 and 40–6–22.
The director of the department of social and rehabilitative services, with the approval of the governor, shall, with respect to sections 40–6–6, 40–6–7 and 40–6–8, establish standards of assistance based upon a fair averaging method and in accordance with all appropriate federal regulations; and provided further that supplementary payment may be made for moving costs or as a result of an emergency of a catastrophic nature which said emergency is defined as a fire or natural disaster."

3. R.I.G.L. § 35–3–16 provides:
"*35–3–16. Reduction or suspension of appropriations to maintain balanced budget.*—At any time during the fiscal year, upon notification by the budget officer that it is indicated that actual revenue receipts will not equal the original estimates upon which

appropriations were based, the governor, for the purpose of maintaining a balanced budget, shall have the power to reduce or suspend appropriations for any or all departments or subdivisions thereof, excepting the general assembly, legislative agencies and legislative committees and commissions."

4. R.I.G.L. § 35–3–18 provides:
"*35–3–18. Transfer between appropriations.*—In case of an emergency, or unforeseen circumstances not existing at the time of making an appropriation, any department may request the transfer of a portion of any item of appropriation to another item of appropriation made for the same department; and the budget officer with the approval of the governor, may issue an order for any such transfer; provided that no such transfer shall operate to increase the total of the amounts appropriated for any such department; and the budget officer shall record the same and cause the accounts of the appropriations affected to be changed accordingly; provided, however, that any transfer of funds between the general assembly, legislative agencies, and legislative committees and commissions, shall be approved only by the joint committee on legislative affairs."

5. Art. I § 6 of Ch. 260, 1975 Public Laws, provides:
"Sec. 6. The director of administration with the approval of the governor, is hereby au-

ed that the Governor has not attempted to comply with any of these provisions in withholding the SI herein and that none of them recognizes the purposes for which the Governor has suspended the SI. The defendants acknowledge that in addition to the foregoing procedures, the Governor can avert a budgetary crisis by seeking a deficiency appropriation from the legislature. *See* R.I.G.L. § 35–3–8. It is quite clear that the State legislature has fashioned an explicit statutory scheme which gives the Governor the flexibility to make the readjustments necessary to maintain a balanced budget during the course of the fiscal year. The comprehensiveness of this explicit statutory scheme belies the defendants' assertion that it gives rise to an implicit delegation of virtually unlimited authority to the Governor to withhold appropriations.

■ Lastly, I find nothing in the FY 1976 budget which even arguably supports the defendants' assertion that the decision to disburse the SI appropriation had been delegated to the Governor. The SI appropriation was given no special treatment in the budget, and simply appears as a line item separate from general appropriations for AFDC and GPA, within the total appropriation to the Department of Social and Rehabilitative Services. The defendants contend that the approval of this, and, it would appear, any, appropriation authorized by this legislation constituted nothing more than an expression of legislative intent to permit the Governor to decide if he wanted

thorized and empowered to transfer any excess funds in any appropriation item or any part thereof appropriated for the support of any department or agency to any other items for the support of any function or functions in the same department or agency."
As noted above, the defendants have not repudiated their original position before the state legislature that a standards increase was urgently needed. Thus, the SI appropriation clearly cannot be considered "excess" funds within the meaning of § 6 of Ch. 260.

6. The contrary intention is expressed in R.I. G.L. §§ 35–3–1 and 35–3–2.
    "*§ 35–3–1. Budget Officer—Duties.* . . . Provided, however, that the budget officer's duties and powers relating to budgetary controls and personnel requests of the legislative

to spend any or all of the sums approved. "But legislative intention, without more, is not legislation." *Train v. City of New York*, 420 U.S. 35, 45, 95 S.Ct. 839, 845, 43 L.Ed.2d 1 (1975). I find no support for defendants' extraordinary proposition in Ch. 260 or any other Rhode Island statute.[6] I, therefore, conclude that the defendants have not complied with state law in withholding the SI appropriation.

### *Federal Statutory Claim*

The plaintiff also contends that the defendants' refusal to disburse the SI appropriation, to the extent it authorizes a standards increase for AFDC, conflicts with 42 U.S.C. § 602(a)(23) by obscuring and lowering the standard of need. Plaintiff acknowledges that, upon implementation of the flat grant, Rhode Island was under no obligation to account for further inflation and increase its standards of need. *Roselli I, supra*, 508 F.2d at 1282. However, in May 1975, the General Assembly appropriated over $2.3 million to implement such a "standards increase". Up to this point, Rhode Island has always purported to pay 100% of need. *Roselli I, supra*. Plaintiff argues that, by refusing to disburse the SI appropriation, the defendants have obscured the new, increased standard of need by continuing to set the AFDC "level of payments" on the basis of the old "standard of need" and have avoided their responsibility to acknowledge that fact and implement a ratable reduction.[7]

department shall be purely ministerial, concerned only with the availability of the funds, and in no event shall the budget officer interpose his judgment regarding the wisdom or expediency of items of expenditure."
"*35–3–2. Annual appropriations for state government.*—The general assembly shall annually appropriate *such sums as it may deem necessary* to pay the administrative and other expenses of the state government." (Emphasis added.)

7. Requiring the State to undertake the two-step approach of first acknowledging an increase in standards of need, and then implementing a ratable reduction would do more than force the State "to accept the political consequences of such a cutback and [bring] to light the true extent to which actual assistance falls short of

▮ The defendants counter with the argument that no increase in standards can occur unless and until the SI money is actually distributed. Until that time, the "standard of need" remains unchanged, despite the General Assembly's action in May, 1975. This argument is based upon the specious proposition that the SI appropriation constituted nothing more than an expression of legislative sentiment. While actual practice may be relied upon to give content to an ambiguous standard of need, *see Bourgeois v. Stevens,* 532 F.2d 799 (1st Cir. 1976), it cannot itself establish a standard which totally disregards a legislative decision to increase the content of its standard. *See Roselli I, supra,* 508 F.2d at 1280. *Cf. Bourgeois v. Stevens, supra* at 806 n. 13.

▮ This Court has no doubt that the defendants' refusal to disburse the SI appropriation effectively obscures, and indeed negates, the State's statutory determination as to the true standard of need. This conclusion does not resolve, however, the critical question whether this refusal conflicts with 42 U.S.C. § 602(a)(23).

"In *Rosado v. Wyman, supra,* the Supreme Court construed the first clause in § 402(a)(23) [42 U.S.C. § 602(a)(23)] as requiring all participating states, by July 1, 1969, to make a *one time only* cost of living adjustment in its standard of need and as prohibiting the states from diminishing the content of its standard of need below that which was in effect on January 2, 1968, the date the statute was passed." *Bourgeois v. Stevens, supra* at 803 (emphasis added; footnote omitted). So long as it complies with the "fair pricing" and "fair averaging" requirements of § 602(a)(23), a state may convert its method for determining need to a flat grant program. Once this is correctly done, the state is under no further *federal* obligation to adjust its standard of need to reflect further inflation. *Roselli I, supra,* 508 F.2d at 1282.

▮ In the instant case, it is undisputed that the state did not violate § 602(a)(23) in implementing the non-shelter flat grant in 1973. The State has not subsequently attempted to rescind its compliance with § 602(a)(23) by reducing or obscuring the non-shelter standards set in 1973; present in this case is the very increase in standards to account for subsequent inflation which is not federally required after valid implementation of a flat grant program. I cannot conclude that § 602(a)(23) is implicated in either the State's enactment of the SI appropriation or its failure to disburse it. The State's failure to comply with § 602(a)(23) in implementing a shelter flat grant is the subject of a separate opinion rendered today which requires the State to compute the standard of need on the basis of current figures because no acceptable previous figures are available. The State's passage of the SI appropriation has no bearing on that decision. The Court therefore can find no violation of § 602(a)(23) in the defendants' refusal to disburse the SI appropriation.[8]

the minimum acceptable." *Rosado v. Wyman, supra,* 397 U.S. at 413, 90 S.Ct. at 1218. By increasing the standards of assistance, the Rhode Island legislature has concluded: 1) that persons already receiving AFDC and GPA need more money to cope with rises in the cost of living; and 2) that some persons previously considered ineligible for AFDC and GPA because their incomes were too great are now rendered eligible due to the increase in the income level deemed maximally acceptable. As to this latter group, eligibility for AFDC or GPA represents more than entitlement to cash benefits (which could be eliminated by a ratable reduction); it also makes them eligible for non-cash benefits, such as Medicaid, whether or not the implementation of a ratable reduction effectively deprives them of cash pay-

ments. In addition, the potential political consequences attendant upon a ratable reduction might prod the State into disbursing the SI in full. *See also Bourgeois v. Stevens,* 532 F.2d 799, 803 (1st Cir. 1976).

8. At oral argument plaintiff contended that the State's failure to implement a lawful, consolidated flat grant in November 1973 precludes a ruling that 42 U.S.C. § 602(a)(23) was satisfied as to the non-shelter portion of the flat grant implemented. The proper focus, she argues, is the total flat grant, which was designed to consolidate both shelter and non-shelter standards. Until that single flat grant is lawfully implemented, it is argued, § 602(a)(23) controls and the State is not relieved of its self-imposed duty to update its standards.

In view of my conclusion that the defendants have not complied with state law in withholding the SI appropriation, I need not address the merits of plaintiff's constitutional claim. Plaintiff and her class (all AFDC and GPA recipients) are entitled to declaratory relief and a permanent injunction prohibiting the defendants from refusing to disburse the SI appropriation unless they fulfill the conditions of either R.I. G.L. §§ 35–3–16, 35–3–18 or Ch. 260, Art. I § 6 of the Rhode Island Public Laws of 1975.

Resolution of this issue rests upon a determination as to when the State's self-imposed update requirement is "tolled" by implementation of a flat grant program. The defendant in the *Roselli I* decision on the merits contended that it was tolled as to both shelter and non-shelter standards in November 1973. Plaintiff herein contended in *Roselli I* that, *as to the shelter portion* of the flat grant, it had not yet been tolled because the State had failed to implement a lawful flat grant for shelter. Without resolving the legal merits of these positions, the Court in *Roselli I* concluded that the defendant's position could not factually be sustained because the lawful 1973 shelter flat grant could not be determined. *Roselli I, supra,* 373 F.Supp. at 40, 43 and n. 3. As a result, the Court concluded that the State is forced to rely on current figures in computing the shelter portion of its flat grant.

This was the relief requested by plaintiff. At no time did plaintiff in *Roselli I* contend that the State's failure to implement a lawful flat grant in toto requires it to account for inflation since 1973 as to the successfully implemented non-shelter portion. Yet that is the basis of plaintiff's position herein—that the State is not excused from accounting for post-implementation inflation because it did not succeed in implementing a single flat grant in 1973. Two responses come to mind. First, this argument should have been raised in *Roselli I.* Second, the State's enactment of a standards increase appropriation is completely irrelevant to ultimate acceptance or rejection of the plaintiff's position. If the update requirement for non-shelter needs was "tolled" in November 1973, recognition of subsequent inflation is not federally required by § 602(a)(23). If it was not "tolled" in November 1973, the State would be obligated under § 602(a)(23) and its own update requirement to account for all inflation up to the moment of successful implementation of a single flat grant, and this obligation would be imposed upon the State whether it had passed a standards increase or not.

In view of plaintiff's failure to challenge the validity of the 1973 non-shelter flat grant at any time, either in *Roselli I* or herein, the Court cannot conclude that its implementation was not in accordance with controlling federal law. In addition, it is not contended that the defendants' failure to implement the SI appropriation in any way effected a retrogression beneath levels established in the 1973 non-shelter flat grant. Under these circumstances, the Court must conclude that the State satisfied § 602(a)(23) in full in its 1973 implementation of the non-shelter flat grant and was thereby relieved of any further *federal* requirement to account for inflation as to those standards.